[No. A140284. First Dist., Div. Five. Jan. 13, 2015.]

KENNETH GONSALVES, Plaintiff and Respondent, v.
RAN LI, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.2.–5. and II.B.–D.

COUNSEL

Stratman, Patterson & Hunter, Edward J. Rodzewich; Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino and Charles E. Tillage for Defendant and Appellant.

Brady Law Group, Steven J. Brady; and Laura S. Liccardo for Plaintiff and Respondent.

OPINION

**BRUINIERS, J.**—Appellant Ran Li crashed a new BMW during a test drive. Kenneth Gonsalves, a salesperson for the BMW dealership, was a passenger in the vehicle. Gonsalves sued, alleging that Li[1] drove recklessly during the test drive, causing the accident, and that Gonsalves suffered significant back injuries as a result. A jury found that Li was negligent and Gonsalves was not comparatively negligent, and awarded Gonsalves more than $1.2 million in damages. Li argues the trial court committed numerous evidentiary errors and failed to adequately investigate juror misconduct. He further argues that Gonsalves's trial counsel committed multiple acts of misconduct. We conclude the trial court erred in admission of certain evidence and find that Gonsalves's counsel committed misconduct in at least two instances. We conclude that the cumulative prejudice from these errors requires the verdict be set aside and the matter be remanded for new trial.

## I. BACKGROUND

### *Undisputed Facts*

On December 28, 2008, Gonsalves assisted potential customers Xiaoming and Li at a BMW dealership in Concord. Gonsalves accompanied them on test drives of a BMW 335 and of a more powerful car, a BMW M3. Xiaoming drove the first half of the M3 test drive and Li drove the second half. During the M3 test drive, Li exited the highway to return to the dealership, but then pressed an "M button" in the car and returned to the highway. He lost control of the vehicle in the curve of the on-ramp. The car's rear wheels lost traction and the car hit the guardrail, turning to face oncoming traffic. None of the airbags deployed and there were no skid marks. Accident reconstruction experts for both parties agreed that the M3 was traveling about 25 miles an hour when it entered the curve of the on-ramp, and then accelerated. California Highway Patrol officers interviewed the parties shortly after the accident. Gonsalves reported that the driver had accelerated in a turn, spun the vehicle out, and hit the guardrail. Li reported that, after he exited the highway, Gonsalves told him about the functions of the M button; Li pushed the M button and returned to the highway; and the accident occurred as he accelerated in the curve of the on-ramp.

---

[1] The original complaint named both Gonsalves and his wife as plaintiffs and both Li and his father, Xiaoming Li (hereafter Xiaoming; no disrespect intended), as defendants. Gonsalves's wife was dismissed as a plaintiff at her request. Xiaoming apparently also was dismissed as a defendant midtrial.

*Gonsalves's Version*

Gonsalves testified that when Li and Xiaoming arrived at the dealership they expressed interest in test driving both the 335 and M3, but Gonsalves persuaded them to test drive the less powerful 335. Only Xiaoming drove the 335. When Xiaoming asked if he could test drive the M3, Gonsalves told him the dealership typically only allows "confirmation test drives" of the M3— i.e., test drives after an agreement on price and confirmation of a customer's ability to pay—because purchasers want to buy those cars with no mileage on them. Xiaoming told Gonsalves he lived in Orinda, was wealthy enough to pay cash for the car, and was very interested in buying the car. Because Gonsalves was concerned that he had insulted Xiaoming, he let Xiaoming test drive the M3 without the usual confirmatory paperwork.

Xiaoming initially drove the M3 and then asked Gonsalves if his son could drive the car. Gonsalves initially said no, but relented after Xiaoming told him Li was a very safe driver who had never received any tickets. When Li got on the highway, he accelerated to 120 miles per hour and began to weave dangerously between cars. Gonsalves repeatedly told Li to slow down. As Li was returning to the dealership, he asked Gonsalves about various buttons on the dashboard, including the M button. Gonsalves told him not to press the M button. Li accelerated to 60 to 80 miles per hour and headed toward the highway on-ramp—both Xiaoming and Gonsalves told him to slow down— and sometime before he got on the highway on-ramp, he pressed the M button. He told Gonsalves, "I'm just going to get on the freeway and I'll get right back off." As he accelerated into the curve of the on-ramp, he lost control of the vehicle.

According to medical reports, Gonsalves told doctors that he was injured when a test driver accelerated to 120 miles per hour and ran into a wall. In response to an interrogatory, Gonsalves wrote that the car was going about 80 miles an hour on the on-ramp. In a deposition, Gonsalves said the car was going 50 to 60 miles an hour at the time of the crash. At trial, Gonsalves said he could not estimate the car's speed in the curve of the on-ramp, but he was sure it was traveling faster than 25 miles an hour. He admitted it was not traveling 80 to 85 miles per hour on the on-ramp. Gonsalves testified that he tried to tell the CHP officers about Li's dangerous driving on the highway, but the police directed him to describe only what happened during the accident itself.

Gonsalves's expert testified that the accident occurred because of driver error: the driver accelerated and turned the steering wheel in a manner that caused the car to exceed the maximum friction in the roadway. "This is clearly not a turn where 25 miles an hour is maintained constant through the

turn. [¶] . . . [¶] It's 20 or 25 miles an hour starting into the turn and then gunning it and turning the steering wheel hard. That's what caused the accident." The expert acknowledged that the M button might have been programmable to disengage the car's dynamic stability control system, which was designed to automatically direct braking power to wheels that start to slip. He acknowledged that the car might have handled differently with the stability control disengaged and, because it was unknown how the M button was programmed, it would have been imprudent of Gonsalves to suggest that Li press the M button if he did so—such an act might have contributed to the accident. "If the driver thinks he's got more capability than he does, then he may exceed those capabilities." Gonsalves's expert nevertheless opined that the accident was caused by driver error regardless of whether the M button had disengaged the stability control system.

### Li's and Xiaoming's Version

Xiaoming testified that he went to the BMW dealership because he was interested in purchasing a new car that he would share with Li, who had just finished college and was working in San Francisco. Gonsalves suggested they test drive a 335. He collected driver's licenses from Xiaoming and Li and, per their agreement, Xiaoming drove the first half of the 335 test drive and Li drove the second half. After the 335 test drive, Gonsalves asked if there was anything they did not like about the car and they said they preferred a stick shift. He suggested they test drive a manual transmission M3. Again, per their agreement, Xiaoming drove the first half of the test drive and Li drove the second half. Xiaoming could tell immediately that the M3 was very different from the 335. When Li took over, he drove about 85 miles per hour and passed some cars but he was not "weaving." Xiaoming told him to be careful; Gonsalves said nothing.

Li exited the highway and was about to return to the dealership when Gonsalves said, "Oh, do you want to see the full potential of the car? There's a button. If you press the button, it's going to change the behavior of the car." Gonsalves pointed out the M button and said it would cause the car to stiffen and release a lot of power. Because travel had to be at a sufficient speed to feel the difference, Gonsalves advised them to get back on the highway to try it out. Li rapidly accelerated in the curve of the on-ramp, and the car started moving sideways as well as forward. Xiaoming told Li to be careful, but Li "must have pressed on the brake so hard, [because] then the car was totally out of control. It spun a little bit and hit [the] guardrail." It happened very quickly. "[T]he car had indeed stiffened substantially . . . once the car was in motion with sufficient speed . . . ." Li similarly testified that pressing the M button somehow changed the car's performance "so when I made that turn, a turn that I would typically think was a safe speed, the car lost control." He

had had no trouble driving the M3 before the button was pushed. Following the accident, Gonsalves calmly and cordially told Xiaoming that the accident occurred because Li was not used to driving a rear-wheel-drive vehicle.

The defense expert opined that pressing the M button affected the way the accident happened. "[T]he Dynamic Stability Control on the vehicle was clearly off when this accident occurred; otherwise, we wouldn't see the rear of the vehicle spinning out or coming out to the left as it did in this accident." When the wheels are spinning, the speed of the vehicle does not increase. Thus, the accident was not caused by excessive speed. Instead, "pressing the accelerator caused the rear wheels to spin, which is what caused the vehicle to lose control. That was all caused by the Dynamic Stability Control being turned off."

### Gonsalves's Injuries

Gonsalves testified that he was thrown around from side to side and back and forth as the car spun. For years after the accident, he suffered from neck and back pain, had a limited range of motion in his neck, and developed numbness and tingling in his upper extremities. When pain medication, physical therapy and epidurals failed to alleviate his symptoms, Gonsalves underwent artificial disk replacement surgery in May 2013, which provided substantial relief. He anticipated having further surgery on another disk in the future. It was disputed at trial whether Gonsalves's medical problems after the accident were caused by the accident or were normal degenerative problems typical of persons his age.

In closing argument, plaintiff's counsel asked the jury to award $118,643.86 in past medical expenses, $80,518.80 in future medical expenses, and between $744,993 and $1,495,986 in pain and suffering damages. Defense counsel argued Li had not been negligent and that Gonsalves's past medical expenses were overstated, future medical expenses were unproven, and noneconomic damages were in the range of $35,000 to $40,000.

### Verdict and Motion for New Trial

The jury found only Li negligent and awarded Gonsalves $118,642.86 for past medical expenses, $90,000 in future medical expenses, and $1 million in noneconomic damages. The trial court denied Li's motion for a new trial, and entered judgment against Li for $1,208,642.86.

## II. DISCUSSION

### A. Evidentiary Errors

Li argues the trial court made several errors in admitting evidence and allowing examination on certain subjects. With the exception of one issue of statutory interpretation, we review these issues for abuse of discretion. (*People v. Foss* (2007) 155 Cal.App.4th 113, 124–125 [65 Cal.Rptr.3d 790].)

#### 1. Requests for Admission

Li argues the court erred in permitting plaintiff's counsel to examine Li about his negative responses to Gonsalves's requests for admission (RFA's) and admitting those responses in evidence. We agree that this was error.

##### a. Background

Gonsalves called Li as an adverse witness during his case-in-chief. Plaintiff's counsel had Li confirm that he prepared responses to Gonsalves's RFA's and swore under penalty of perjury that his responses were true. The court instructed the jury: "Before trial, each party has the right to ask another party to admit in writing that certain matters are true. If the other party admits those matters, you must accept them as true. No further evidence is required to prove them. However, these matters must be considered true only as they apply to the party who admitted they were true. [¶] So prior to the trial during this discovery process, the plaintiff sent the defendant these Requests for Admissions. Plaintiff's counsel is now asking the witness about those requests. [¶] The other side can do the same."[2]

Plaintiff's counsel then told the jury that Li was asked to admit that "at the time as you began your turn from Concord Avenue onto Highway 242 northbound on-ramp you were driving too fast for the conditions," and that Li replied, "Responding party has a lack of information and knowledge to admit this Request for Admission. A reasonable inquiry concerning this matter has been made, and the information known or readily obtainable is insufficient to enable responding party to admit this matter." Plaintiff's counsel extensively examined Li on this and similar responses to RFA's over multiple defense objections.[3] When Li testified in the defense case-in-chief, plaintiff's counsel again asked questions in cross-examination about Li's responses to the RFA's and elicited Li's statement, "I stand by my admissions that I signed."

---

[2] In this case, however, counsel examined Li not about his admissions, but about his failure to make admissions.

[3] Excerpts of the examination are set forth in an appendix to this opinion (see appen., *post*, at pp. 1419–1420).

Defense counsel made at least nine objections that questions about Li's denials of the RFA's were argumentative, that "these are not exhibits in the case," and that the questions called for legal opinions or were contention questions.[4] All of the objections were overruled.

At the conclusion of Li's testimony, the court admitted in evidence the full sets of the RFA's and special interrogatories that asked Li to explain any denials to the RFA's, as well as Li's responses to both.[5] Defense counsel moved to strike and exclude all testimony regarding Li's responses to the RFA's and to admonish the jury to disregard the evidence. The motion was denied.

In closing argument, plaintiff's counsel urged the jury to consider Li's failure, in response to the RFA's, to admit that his pressure on the accelerator was a substantial factor in causing the accident as evidence of his failure to take responsibility for Gonsalves's injuries. Counsel told the jury, "I encourage you to look at . . . the Requests for Admissions that we sent to Ran Li asking him to admit some very basic facts about this crash. His responses are there as well. Let's just look at a few of them. . . . [¶] . . . [¶] This is a simple question, ladies and gentlemen. 'How much did you push on the accelerator.' [His response] is a bunch of double speak[,] . . . a bunch of 'I'm sorry I'm not taking responsibility and not only am I doing it, I'm doing it in a way that makes no sense.' [¶] . . . [¶] . . . [I]t's been more than four and a half years since this crash, and he will not in any way take any responsibility for it. . . . And that's why we need to impanel a jury like you."

Posttrial, Li renewed his argument that the examinations were improper in his motion for a new trial: "Such questions add no facts to the case, deny the defendant representation, and improperly inflame the jury." The court denied the motion.

---

[4] Defense counsel further insisted that "[A]ll of these questions violated defendants' motion in limine number 3. That motion prohibited any questioning concerning whether or not the defendant takes responsibility for the accident or took responsibility during litigation."

[5] Defense counsel initially objected to admitting the written responses to the RFA's in evidence. He contended that if responses were admitted, Li's explanations for those responses should also be admitted. Plaintiff's counsel suggested admitting all of the RFA's, responses and the corresponding special interrogatories and responses. Defense counsel asked the court to admit a single form interrogatory propounded by Li and Gonsalves's response, and plaintiff's counsel asked that it be presented in context with all of the other form interrogatories and responses. Defense counsel then said, "I could compromise, Your Honor. It looks like they are putting in all the admissions. If they put in all the admissions . . . and our explanation[s], I don't mind if they all come in. That's not really my biggest problem with the admissions. It was questioning [Li] on it." The court admitted the full set of RFA's, the redacted responses, the special interrogatories, and responses.

### b. *Analysis*

Li argues that the discovery statutes do not authorize admission at trial of denials to RFA's and that the trial court erred in allowing plaintiff's counsel to examine him about his qualified denials and in admitting the written responses. We agree.

As a preliminary matter, Gonsalves argues defense counsel implicitly waived any objection to admission of Li's responses when he stipulated to admission of the written responses at trial. As set forth *ante*, however, the defense made this stipulation only after the court had overruled its objections to use of the responses during the examinations of Li and after the court appeared unpersuaded by defense counsel's arguments that the written responses were not admissible evidence. In context, therefore, the stipulation cannot be deemed truly voluntary or an intentional waiver of the objection. (See *Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 650 [40 Cal.Rptr.3d 501] ["[n]o waiver may be implied where, as here, a party alleging error has made its objection and then acted defensively to lessen the impact of the error"].)

 Interpretation of the discovery statutes is subject to our de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) Li notes that the discovery statutes expressly allow *any part of* a deposition or interrogatory to be introduced at trial (with certain restrictions not relevant here), whereas the statutes provide only that *admissions* in response to RFA's are binding on the party at trial. (Code Civ. Proc., §§ 2025.620 ["any *part* or all of a deposition" (italics added)], 2030.410 ["*any* answer or part of an answer to an interrogatory" (italics added)], 2033.410, subd. (a) ["[a]ny matter *admitted* in response to [RFA's]" (italics added)]; see Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2013) ¶ 8:828, p. 8C-104.3 (rev. # 1, 2011) ["[*a*]*dmissions* made in response to [RFA's] . . . may be received into evidence at trial" (italics added)].) Li further notes that the statutory scheme provides for monetary sanctions (i.e., reasonable expenses including attorney fees) when a party unreasonably fails to admit a matter in response to RFA's, but does not expressly permit a denial, objection or failure to respond to RFA's to be used against the party at trial. (Code Civ. Proc., § 2033.420, subd. (a).) He argues that the statutory scheme therefore implies that the only authorized sanction for an unreasonable failure to admit is a monetary award and a denial cannot be used to impeach a witness at trial. In this case, the court actually *denied* sanctions for Li's failure to admit the RFA's, yet the court allowed Li to be impeached with that same conduct. Gonsalves argues that the statutes are essentially silent on the subject of whether denials or qualified denials are admissible at trial, leaving the admissibility subject to the trial court's discretion.

Neither Li nor Gonsalves cites authority that we find to be directly on point. Our own research reveals a somewhat surprising paucity of relevant authority. In *Morris v. Frudenfeld* (1982) 135 Cal.App.3d 23 [185 Cal.Rptr. 76] (*Morris*), the appellant asserted it was error not to permit impeachment of the respondent by showing that certain denials to RFA's were inconsistent with respondent's admissions on the witness stand. (*Id.* at p. 35.) Citing Evidence Code section 352, the trial court declined to permit reading of the denials to the jury on the basis of excessive time consumption. Noting that the record was unclear as to precisely what pretrial denials appellant was attempting to introduce, the reviewing court held that such a ruling was within the sound discretion of the trial judge. (*Morris*, at pp. 35–36.) While perhaps implicitly suggesting that admission at trial of denials to RFA's is committed to the trial court's discretion and not precluded by statute, the case does not so hold. The issue presented in *Morris* was whether the court could properly exclude an allegedly inconsistent prior statement. Gonsalves does not allege any inconsistency between the discovery responses and trial testimony. In fact, he argued to the jury that they should draw adverse inferences from the fact that Li *continued* to deny the request, consistent with his earlier responses.

Li analogizes the examinations by plaintiff's counsel to asking a witness to explain the basis of his legal contentions, conduct condemned in *Rifkind v. Superior Court* (1994) 22 Cal.App.4th 1255 [27 Cal.Rptr.2d 822] (*Rifkind*). In *Rifkind*, the witness was asked at deposition to state with respect to each of his affirmative defenses: "all facts that support the affirmative defense"; "the identity of each witness who has knowledge of any facts supporting the affirmative defense"; and the identity of "any documents that pertain to the facts or witnesses." (*Id.* at pp. 1257–1258.) The Court of Appeal condemned the practice, which it referred to as asking "legal contention questions," but held the same questions could properly be asked in interrogatories. (*Id.* at pp. 1256, 1260.) The distinction between these discovery devices is that " 'the client presumably knows the facts (although not always), but he can hardly be expected to know their legal consequences. This is what lawyers are for. . . .' [Citation.]" (*Id.* at p. 1260.) "[L]egal contention questions require the party interrogated to make a 'law-to-fact application that is beyond the competence of most lay persons.' [Citation.] Even if such questions may be characterized as not calling for a legal opinion [citation], or as presenting a mixed question of law and fact [citation], their basic vice when used at a deposition is that they are unfair. They call upon the deponent to sort out the factual material in the case according to specific legal contentions, and to do this by memory and on the spot." (*Id.* at p. 1262.)

While not directly on point, we agree that the underlying concerns discussed in *Rifkind* apply to the use of qualified denials to RFA's in the examinations here. Li was asked to explain "by memory and on the spot" and without the ability to consult with his attorney why he took the legal position

that he could not admit or deny certain RFA's without further inquiry. And he was asked to do this not in a deposition, as in *Rifkind*, but in front of the jury.

The weight of authority in other jurisdictions also favors Li's position. Massachusetts's highest court interpreted a statutory scheme similar to California's[6] and concluded that denials to RFA's are not admissible evidence at trial: "The purpose of [RFA's] is to narrow the issues for trial by 'identifying those issues and facts as to which proof will be necessary.' [Citation.] A denial . . . is not a statement of fact; it simply indicates that the responding party is not willing to concede the issue and, as a result, the requesting party must prove the fact at trial.[7] [Citations]. The sanction for improperly responding to [RFA's] is the shifting of the award of incurred expenses[—see rule 36(a) of the Massachusetts Rules of Civil Procedure]. [¶] Further, [Massachusetts Rules of Civil Procedure, rule 36(b)], which governs [RFA's], does not specifically provide for the admission of denials in evidence. Although the rule states that admissions are conclusively binding on the responding party, it makes no parallel provision for the use of a denial. By contrast, [Massachusetts Rules of Civil Procedure, rule 33(b)], governing interrogatories, states that the answers to interrogatories 'may be used [at trial] to the extent permitted by the rules of evidence.' The omission of a similar provision in rule 36(b) indicates that, although admissions have binding effect, denials do not have such an effect and cannot be introduced in evidence." (*Gutierrez v. Massachusetts Bay Transportation Authority* (2002) 437 Mass. 396 [772 N.E.2d 552, 567], final brackets in original.) Therefore, the trial court "incorrectly concluded that a denial of a request for admission is admissible as a prior inconsistent statement" to impeach a witness at trial. (*Ibid.*)

Intermediate appellate courts in at least three states have similarly held that denials of RFA's are inadmissible at trial. (See *Winn Dixie Stores, Inc. v. Gerringer* (Fla.Dist.Ct.App. 1990) 563 So.2d 814, 817 [citing *Morris, supra*, 135 Cal.App.3d 23 for the proposition that "denials cannot be used for impeachment purposes"]; *Mahan v. Missouri Pacific Railroad Co.* (Mo.Ct.App. 1988) 760 S.W.2d 510, 515 ["the propriety of defendant's denials is for the court to decide, not the jury"]; *American Communications v. Commerce North Bank* (Tex.App. 1985) 691 S.W.2d 44, 48 ["[w]hen an answering party denies or

---

[6] Compare Code Civil Procedure sections 2030.410 (use of interrogatories), 2033.410 (effect of admissions), 2033.420 (sanctions) with Massachusetts Rules of Civil Procedure, rules 33(b), 36(b), 37(c).

[7] The California Supreme Court has expressed a similar view of the purpose of RFA's: "Most of the other discovery procedures are aimed primarily at assisting counsel to prepare for trial. [RFA's], on the other hand, are primarily aimed at setting at rest a triable issue so that it will not have to be tried." (*Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 429 [15 Cal.Rptr. 127, 364 P.2d 303]; see *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 775 [167 Cal.Rptr.3d 517].)

refuses to make an admission of fact, such refusal is nothing more than a refusal to admit a fact"].) In most cases the use of denials of RFA's to impeach a witness at trial "is nothing more than an attack on the 'character' of the defendant and that issue [i]s not before the jury."[8] (*Mahan v. Missouri Pacific Railroad Co.*, at p. 515.)

Perhaps recognizing the lack of any inconsistency between Li's responses to the RFA's and his trial testimony, Gonsalves suggests that the responses were admissible to impeach Li's credibility by showing "[h]is attitude toward the action in which he testifies." (Evid. Code, § 780, subd. (j).) Gonsalves cites no cases that support his interpretation of this section of the Evidence Code. Section 780 has been held applicable to a witness's reluctance to testify or fear of retaliation for testifying (*People v. Merriman* (2014) 60 Cal.4th 1, 84 [177 Cal.Rptr.3d 1, 332 P.3d 1187]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084 [132 Cal.Rptr.3d 808, 263 P.3d 1]) or a witness's desire for revenge against the defendant (*People v. Stewart* (1983) 145 Cal.App.3d 967, 976–977 [193 Cal.Rptr. 799]). As Li points out, courts have held in other contexts that litigation conduct is not relevant evidence at trial in the ordinary case. (*Palmer v. Ted Stevens Honda, Inc., supra,* 193 Cal.App.3d at p. 539 ["[o]ne significant defect in such evidence is that it holds the client responsible for the attorney's litigation strategy"].) *White, supra,* 40 Cal.3d 870, which allows such evidence in a bad faith case, has been criticized as unfairly compromising a defendant's right to defend himself. (See *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1327–1329 & fn. 5 [12 Cal.Rptr.2d 95].) We find no support for Gonsalves's attempt to make a party's litigation conduct a legitimate subject for inquiry under Evidence Code section 780, subdivision (j), absent truly exceptional circumstances.

We are persuaded, therefore, that denials of RFA's are not admissible evidence in an ordinary case, i.e., a case where a party's litigation conduct is not directly in issue. Thus, the trial court permitted examination of Li that was unfair and prejudicial to him, and erred in admitting those responses in evidence.

---

[8] At least one court has held that such refusal may be relevant evidence of bad faith at trial in bad faith insurance cases. (*Home Ins. Co. v. Owens* (Fla.Dist.Ct.App. 1990) 573 So.2d 343, 344; see *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 885–886 [221 Cal.Rptr. 509, 710 P.2d 309] (*White*) [insurer's litigation conduct admissible in bad faith insurance case], superseded by statute on other grounds as stated in *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 297 [147 Cal.Rptr.3d 88].) However, the court expressly distinguished non-bad-faith cases, where the party's litigation conduct is not directly relevant to an issue before the jury. (*Home Ins. Co. v. Owens*, at p. 344 [distinguishing *Winn-Dixie Stores, Inc. v. Gerringer, supra,* 563 So.2d 814].) This distinction is consonant with California law. (See *Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 538–539 [238 Cal.Rptr. 363] [*White* inapplicable where no special insurer-insured relationship or ongoing contractual relationship].)

2.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. DISPOSITION

The judgment is vacated and the matter is remanded to the trial court for a new trial. Gonsalves shall bear Li's costs on appeal.

Jones, P. J., and Needham, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 25, 2015, S224545.

---

* See footnote, *ante*, page 1406.